I respectfully dissent. Because I find Ferback's statements are inadmissible under Evid.R. 803(4) and there is a reasonable, alternative explanation of the only other evidence indicative of sexual conduct, I would sustain Brewer's first, second and fourth assignments of error and reverse and remand for a new trial.
 {¶ 48} In his first and second assignments of error, Brewer argues that the trial court erred when it allowed hearsay statements from an incompetent witness into evidence. Evid.R. 803(4) excludes from the hearsay rule statements "made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." The rule depends upon the motivation of the declarant to make the statement admissible. State v. Boston (1989), 46 Ohio St.3d 108,121. "The rule's narrow limitation is based upon the belief that the declarant's subjective motive generally guarantees the statement's trustworthiness. Since the effectiveness of the treatment depends upon the accuracy of information given to the physician, the declarant is motivated to tell the truth." Id. quoting State v. Eastham (1988),39 Ohio St.3d 307, 312 (H. Brown, J., concurring).
 {¶ 49} The Ohio Supreme Court relaxed the motivational requirement in Evid.R. 803(4) with regard to children in State v. Dever (1992),64 Ohio St.3d 401. In Dever, the Ohio Supreme Court stated that the common-law basis for the Evid.R. 803(4) exception should be broadened to consider the surrounding circumstances of the statements where young children are concerned. Instead, a trial court should engage in the following inquiry:
 {¶ 50} "The trial court should consider the circumstances surrounding the making of the hearsay statement. If the trial court finds in voir dire that the child's statements were inappropriately influenced by another, then those statements would not have been made for the purpose of diagnosis or treatment. This inquiry will vary, depending on the facts of each case. For example, the trial court may consider whether the child's statement was in response to a suggestive or leading question (as was the case in Idaho v. Wright [(1990), 497 U.S. 805,110 S.Ct. 3139, 111 L.Ed.2d 638]), and any other factor which would affect the reliability of the statements (such as the bitter custody battle in Statev. Boston ). If no such factors exist, then the evidence should be admitted. The credibility of the statements would then be for the jury to evaluate in its role as factfinder. In addition, the witness whose testimony brings in the child's hearsay statement can be cross-examined about the circumstances surrounding the making of the statement. But if the trial court discerns the existence of sufficient factors indicating that the child's statement were not made for the purpose of diagnosis or treatment, the statements must be excluded as not falling within Evid.R. 803(4)." Id. at 410-411.
 {¶ 51} The Dever rationale has been extended to adults who are mentally retarded. See, State v. Burnette (1998), 125 Ohio App.3d 278. Therefore, Ohio courts have found that the Evid.R. 803(4) does not require a competent declarant.
 {¶ 52} The majority appears to presume Ferback's competency but applies Dever, supra, to determine whether the trial court erred in admitting Ferback's statements. In my opinion it is inappropriate to apply Dever if the declarant is competent because Dever involved the admission of statements from a child victim witness who had been declared incompetent to testify. If Ferback was competent, the appropriate inquiry is her motivation in making the statements to nurse Meyer, and the evidence clearly shows that Ferback did not want to receive treatment. Therefore, Ferback's statements cannot be deemed to be trustworthy since that motivation for medical treatment was lacking, and the trial court should not have admitted the statements pursuant to Evid.R. 803(4).
 {¶ 53} If Ferback was incompetent as Brewer alleges[1], her statements still would not be admissible given the surrounding circumstances. While Ferback may have been in a hospital, she was not there to receive treatment for any injury Brewer may have inflicted upon her. Ferback repeatedly refused the proposal of medical treatment when Meyer approached her about it. Ferback continued to refuse medical treatment even after her sister arrived at the hospital. More importantly, Meyer's testimony about her conversation with Ferback is vague. While the nurse stated she explained the importance of her questions, the record does not contain enough detail to allow a determination that Ferback's statements were reliable or trustworthy. The question "Was he in?" was objected to and is certainly open to interpretation.[2] Ferback could have thought the nurse meant "Was he in the room?" or "Was he in the bed?" when she responded to the question. The specific statements attributed to Ferback are simply "yes" and "no" responses to vague, leading questions. Furthermore, Ferback had been given a dose of Demerol, a strong pain medication and narcotic. These circumstances cast doubt upon the reliability of Ferback's statements, and therefore, I would find the trial court erred in admitting the statements pursuant to Evid.R. 803(4) and that Brewer's first two assignment of errors should have been sustained.
 {¶ 54} In Brewer's fourth assignment of error, he alleges his conviction was against the manifest weight of the evidence. In a criminal case, the factfinder must find each element was proved beyond a reasonable doubt. Based on a review of the evidence presented at trial, I would find that the trier of fact clearly lost its way, creating a manifest miscarriage of justice, and that Brewer's conviction for rape and sexual battery was against the manifest weight of the evidence.
The evidence shows that Brewer did take the necessary steps toward committing rape, or sexual battery, or both. He was on Ferback's bed with his pants pulled down and Ferback's gown pushed up. He was also found lying on top of Ferback who had her legs spread apart — something she could have done by herself. However, the evidence does not show beyond a reasonable doubt that Brewer actually engaged in sexual conduct with Ferback. None of the witnesses saw any vaginal intercourse. No one testified that they saw Brewer's penis or buttocks or that specifically his underpants as well as his pants were down.[3] Although the jury reasonably could have convicted on both attempted rape or attempted sexual battery, it never reached these lesser included offenses because it clearly lost its way on the rape and sexual battery charges.
 {¶ 55} The only indication of vaginal penetration was the appearance of Ferback's vaginal area later that evening. But nurse assistant, Rhonda Dabney, provided a reasonable, alternative explanation. She testified as follows on direct examination:
 {¶ 56} "Q. Now, did you observe Phyllis' vaginal area?
 {¶ 57} "A. On the HS care, yes, because we have — HS care means you're cleaning them completely. It's not quite a bath, but you're making sure that there are no abrasions or any discharge or anything like that, or scoring, being burnt by the urine."* * *
 {¶ 58} "Q. Did you find something?
 {¶ 59} "A. There was some puffiness, slightly pink coloration to where she — because she was very much a cream-colored complexion, very — very pale. And there was some pinkishness and a little puffiness there, but we didn't see any discharge or anything of that nature. But there had been some urine there for a time." [Emphasis added.]
 {¶ 60} Because the presence of urine is a reasonable explanation for Ferback's vaginal appearance, the only evidence indicative of sexual conduct, I would Brewer's conviction of rape and sexual battery as against the manifest weight of the evidence and remand for a new trial.
[1] It does not appear that the trial court ever ruled on the issue of Ferback's competency despite the state's comment in opening statements that Ferback was incompetent.
[2] Although the nurse was allowed to testify that she intended to mean had Brewer penetrated, she could not testify regarding Ferback's understanding of that question.
[3] In its brief, the state argues on page 4 that Brewer's pants and underwear were around his ankles and provides a pinpoint citation to the record. An examination of Dabney's testimony reveals that she did not actually say Brewer's underpants were pulled down. At one point she stated "The gentlemen sitting on the bed — squatted on the bed with his pants pulled down around his ankles. You could see his calf area, up to his knees." Later in her testimony, Dabney then stated "And he was down like here, but he was crouched with his pants and everything down around his ankles." It is unclear whether this includes Brewer's underpants because she could have been referring to the bedsheet, which she also indicated was at the foot of the bed.